# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# CIVIL ACTION NO. 3:07-CV-00277-DCK

| | |
|---|---|
| **ROBERT L. SMITH,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **ORDER** |
| ) | |
| **MICHAEL J. ASTRUE,** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

**THIS MATTER IS BEFORE THE COURT** on the Plaintiff's "Motion for Summary Judgment" (Document No. 10) and "Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment" (Document No. 11), filed December 5, 2007; and the Defendant's "Motion for Summary Judgment" (Document No. 13) and "Memorandum in Support of the Commissioner's Decision" (Document No. 14) filed February 5, 2008. The parties have consented to magistrate jurisdiction under 28 U.S.C. § 636(c), and these motions are now ripe for disposition.

Having considered the written arguments, administrative record, and applicable authority, the undersigned finds that the Commissioner's decision to deny Plaintiff's Social Security disability benefits is supported by substantial evidence. Accordingly, the undersigned will **DENY** Plaintiff's Motion for Summary Judgment, **GRANT** the Commissioner's Motion for Summary Judgment, and **AFFIRM** the Commissioner's decision.

## I. PROCEDURAL HISTORY

Plaintiff filed an application for a period of disability, Social Security disability insurance benefits and Supplemental Security Income on August 20, 2002, alleging that he became disabled

on June 1, 1987 as a result of schizophrenia. (Tr. 15, 59-72, 149). Plaintiff's claim was denied initially and on reconsideration. (Tr. 25-30, 33-35). Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which was held on September 8, 2006. (Tr. 36, 241-72). On October 23, 2006, the ALJ issued an opinion denying Plaintiff's claim. (Tr. 12-24).

Subsequently, Plaintiff filed a Request for Review of the hearing decision. On May 25, 2007, the Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 6-9); 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481.

Plaintiff filed this action on July 24, 2007, and the parties' cross-motions for summary judgment are now ripe for disposition.

## II. STANDARD OF REVIEW

The Social Security Act, 42 U.S.C. § 405(g) and § 1383(c)(3), limits this Court's review of final decisions of the Commissioner to: (1) whether substantial evidence supports the Commissioner's decision; and (2) whether the Commissioner applied the correct legal standards. Richardson v. Perales, 402 U.S. 389, 390, 401 (1971); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); see also Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (*per curiam*). The Fourth Circuit defined "substantial evidence" as:

> being more than a scintilla and do[ing] more than creat[ing] a suspicion of the existence of a fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

Smith v. Heckler, 782 F.2d 1176, 1179 (4th Cir. 1986), quoting Peales, 402 U.S. at 401.

The Fourth Circuit has made clear that it is not for a reviewing court to re-weigh the evidence or to substitute its judgment for that of the Commissioner, so long as that decision is supported by

2

substantial evidence. Hays, 907 F.2d at 1456 (concluding that "it is not within the province of a reviewing court to determine the weight of the evidence"); see also Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986); Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972). Ultimately, it is the duty of the Commissioner, not the courts, to make findings of fact to resolve conflicts in the evidence. Hays, 907 F.2d at 1456; King v. Califano, 599 F.2d 597, 599 (4th Cir. 1979) (stating that "this court does not find facts or try the case *de novo* when reviewing disability determinations"); Seacrist v. Weinberger, 538 F.2d 1054, 1056-57 (4th Cir. 1976) (noting that "it is the responsibility of the [Commissioner] and not the courts to reconcile inconsistencies in the medical evidence, and that it is the claimant who bears the risk of nonpersuasion"). Therefore, so long as the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court disagrees with the final outcome. Lester v. Schweiker, 683 F.2d 838, 841 (4th Cir. 1982), quoting Hayes v. Gardner, 376 F.2d 517, 520 (4th Cir. 1967); see also 42 U.S.C. § 405(g) (2008).

### III. DISCUSSION OF CLAIM

The question before the ALJ was whether at any time between June 1, 1987 to the present Plaintiff became "disabled" as that term of art is defined for Social Security purposes.[1] The ALJ must follow a five-step sequential evaluation process when making disability determinations. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); Hall v. Harris, 658 F.2d 260, 264-65 (4th Cir. 1981). The

---

[1] Under the Social Security Act, 42 U.S.C. § 301, et seq., the term disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995).

3

first step is determining whether the claimant is performing any gainful activity.[2] In the instant case, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since his alleged onset of his disability. (Tr. 17). Next, the ALJ must determine whether the claimant's medical condition is severe.[3] Here, the ALJ ascertained that Plaintiff suffered from schizophrenia. Id. Third, the ALJ must consider whether the claimant's impairment or combination of impairments meet or equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. 20 C.F.R. §§ 404.1520(d), 404.1525. 416.920(d), 416.925. In the instant case, the ALJ established that Plaintiff's impairments were not severe enough to prevent Plaintiff from doing any gainful activity and therefore, he did not meet or equal any listed impairment. (Tr. 17). Fourth, the ALJ must determine whether the claimant can perform his past relevant work. The ALJ in the instant case determined that Plaintiff had no past relevant work because he had not worked in the last fifteen years. (Tr. 22). Finally, the ALJ must ascertain whether the claimant, given his age, education, and past work experience, can perform any other work which exists in substantial numbers in the national economy. Here, the ALJ found that Plaintiff retained the residual functional capacity ("RFC") to perform simple, one to two tasks, in a low stress setting with only occasional changes in a work setting, involving no production rate pace work, only occasional exposure to crowds, and tasks dealing with things, rather than people. (Tr. 18). Through the testimony of the vocational expert ("VE"), the ALJ

---

[2] Substantial activity is defined as work involving significant physical or mental activities, which is done for pay or profit. 20 C.F.R. §§ 404.1527(a)-(b), 416.972(a)-(b).

[3] A severe impairment is an impairment or combination of impairments that significantly limit one's ability to perform both physical and mental basic work activities. 20 C.F.R. §§ 404.1520(c), 416.920(c).

determined that Plaintiff's RFC would allow him to perform certain jobs existing in significant numbers in the national economy. (Tr. 22).

The two issues that Plaintiff raises before this Court are whether the ALJ gave proper weight to Plaintiff's treating physician's opinion and whether the ALJ correctly assessed Plaintiff and his wife's credibility during their respective testimonies.

**A.     The ALJ correctly weighed the evidence given by Plaintiff's treating physician.**

Plaintiff contends that the ALJ did not give proper weight to the treating physician's opinion. Plaintiff utilizes a four-part test, which determines whether the Commissioner must give controlling weight to the medical opinion from a treating source. (Document No. 11 at 10), citing SSR96-2p (1996). Plaintiff argues that the ALJ must determine: (1) that the opinion comes from a "treating source," as defined in 20 C.F.R. §§ 404.1502 and 416.927(a); (2) that it is a medical opinion as defined in 20 C.F.R. §§ 404.1527(a) and 416.927(a); (3) that it is well-supported by medically acceptable clinical and laboratory diagnostic techniques; and (4) that it is not inconsistent with other substantial evidence in the individual's case record. Id. Here, Plaintiff argues that all four of these considerations are met and the ALJ incorrectly assessed the evidence provided by Plaintiff's treating physician. However, Plaintiff's argument is unavailing because the opinion was not a medical opinion and it is inconsistent with other evidence within the record.

Plaintiff's primary care physician, Dr. Shirley Ocloo of Gaston Family Health Services, Inc., first saw Plaintiff on January 7, 2003. (Tr. 137). Dr. Ocloo referred Plaintiff to Debbie Crane, a licensed counselor, noting that his past medical history was significant for depression and anxiety and prescribed him Ativan. Id. On January 9, 2003, Plaintiff told Ms. Crane that he had not had any previous mental health treatment or counseling. (Tr. 148). Plaintiff reported that he gets upset

5

easily, could not be in crowds, and was too nervous to do household chores or to drive a car. Id. He stated that he wanted to better control his anger and that he needed to begin counseling in order to make a credible case for his disability claim. (Tr. 147). Ms. Crane opined that Plaintiff appeared to be struggling with significant mental health problems and felt that it was necessary for him to receive psychiatric help. (Tr. 149-50). Her diagnosis ruled out undifferentiated schizophrenia. Id.

On February 24, 2003, Plaintiff was seen at Pathways Mental Health. (Tr. 174). Plaintiff indicated that he wanted help regarding his nerves and that he was seeking a diagnosis that would make him eligible for disability and Medicaid. Id. He reported being fearful of noise, loud voices, traffic, and heights. Id. Although his mood and affect were fearful and anxious, it was noted that his intellectual functioning was average. Id.

At a psychiatric assessment performed by Dr. Shah of Pathways Mental Health on April 21, 2003, Plaintiff said that he had been told about schizophrenia at Gaston Counseling Family Center, researched the mental disease at the library, and felt that he suffered from it. (Tr. 180). Although Plaintiff stated that he had never been hospitalized for depression and had never taken anti-depression medication, he indicated that he had been depressed for years. Id. He reported that he isolated himself and did "not want to do much" because he felt shaky and nervous in crowds. Id. He indicated several suicide attempts, including two the prior year; however, there are no medical reports within the record that relate to these reported events and Plaintiff denies any current suicidal, homicidal, or assaultive ideation. (Tr. 180-81). Plaintiff stated that he was not currently looking for a job and was looking forward to getting disability because he felt that he suffered from schizophrenia. (Tr. 180). Dr. Shah did not see any full syndrome of schizophrenia, but diagnosed

6

a depressive disorder, rated Plaintiff's global assessment of functioning ("GAF") at 50 and prescribed him Lexapro.[4] Id.

In May 2003, Ms. Crane noted that Plaintiff was functioning at "a significantly better level." (Tr. 163). He and his wife had visited family in Ohio for a week. Id. He appeared much more willing to go out in public and somewhat calmer. (Tr. 162). Plaintiff had been visiting with friends, coaching his wife to pass her driving test, and attending church. Id.

In July 2003, Plaintiff returned to Dr. Shah with complaints of mood swings, periods of highs and lows, periods of anger lasting several days or longer, and periods of depression involving feelings of isolation and decreased energy. (Tr. 182, 221). Once again, Plaintiff denied suicidal ideation. (Tr. 182). He stopped taking the Lexapro that had been prescribed to him, stated that he felt that he needed something else, and Dr. Shah prescribed him Depakote ER. Id. Dr. Shah diagnosed Plaintiff with bipolar affective disorder, Type II. Id.

By September 22, 2003, Plaintiff reported to Dr. Shah that although his mood swings were getting better and he was not having any side effects from the medication, he still experienced anger and frustration towards little things. (Tr. 183, 222). On November 10, 2003, Plaintiff still had mood swings and some anger, but was doing "much better" since his dosage of Trileptal had been increased. (Tr. 220).

On November 25, 2003, Dr. Carol Gibbs of North Carolina Disability Determination Services performed a psychiatric evaluation. (Tr. 189-91). She noted that Plaintiff's affect was blunted and his wife tended to answer for him; however, he had a goal-directed thought process that was

---

[4] According to the American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, 1994, a Global Assessment of Functioning of 50 indicates serious symptoms or serious difficulty in social, occupational, or school functioning.

coherent. (Tr. 189). Plaintiff reported that he had attempted suicide about ten times in the past and that he had been diagnosed with bipolar disorder and schizophrenia, for which he was taking Trileptal. Id. Although Plaintiff indicated that at times he was very depressed and could be irritable and angry, he admitted that since taking Trileptal, his mood and impulsiveness had improved. Id. Dr. Gibbs noted that Plaintiff cared for his own hygiene and that his daily activities included driving, going to church, writing poems, housework, listening to music and watching movies. Id. Dr. Gibbs stated that she saw no clear evidence of schizophrenia and she diagnosed him with mood disorder, noting that she thought that he was capable of managing funds in his own best interests. (Tr. 190).

In December 2003, a psychological consultant, Elizabeth Anton, Psy. D., reviewed the medical records and information from Plaintiff's claim and prepared a mental residual functional capacity assessment of him for a North Carolina state assessment. (Tr. 133-35). Dr. Anton indicated that Plaintiff was moderately limited in his ability to understand, remember and carry out detailed instructions, and in his ability to maintain attention for extended periods, but that his ability to understand, remember, and carry out short, simple instructions was not significantly limited. (Tr. 133). She also noted that Plaintiff was moderately limited in his ability to interact appropriately with the general public, but that his ability to work with and get along with co-workers without distracting them or being distracted by them and his ability to accept instructions and respond appropriately to criticism from supervisors was not significantly limited. (Tr. 133-34). Dr. Anton indicated that Plaintiff had a moderate limitation in his ability to respond appropriately to changes in work settings. (Tr. 134).

On July 15, 2004, Dr. L.M. McEwen of Pillai Neuro-Psychiatric saw Plaintiff because Plaintiff stated that Dr. Shah would not give him the type of nerve medication he felt he needed. (Tr.

8

192). Plaintiff complained of anxiety, nervousness when driving, mood swings, and a personality disorder. Id. Dr. McEwen diagnosed Plaintiff with chronic schizophrenia-undifferentiated type ("CSUT") and prescribed Abilify as a mood stabilizer.[5] Id.

On August 5, 2004, at Plaintiff's second visit, Dr. McEwen completed a disability form provided by Plaintiff's attorney. (Tr. 194). He opined that Plaintiff was disabled as a result of schizophrenia; he could not think clearly; he heard voices; and he was permanently disabled. Id. However, in Dr. McEwen's treatment notes from the same date, he indicated that Plaintiff was doing better with the medication he prescribed, had more energy on Abilify, and had better anxiety control on Xanax. (Tr. 193); see generally Gross v. Heckler, 785 F.2d 1164, 1166 (4th Cir. 1986) (holding that symptoms that can be controlled by medication or treatment are not disabling). He noted that Plaintiff's thinking was concrete, with no auditory hallucinations, no visual hallucinations, no delusions, no paranoia, and no flights of ideas. Id.

On August 31, 2004, Dr. McEwen indicated that Plaintiff was doing well on Prozac and Abilify, but complained of nerves and indicated that he needed something "stronger." (Tr. 200). Dr. McEwen increased his Xanax, but noted that they should watch for abuse. Id.

On September 31, 2004, Dr. McEwen noted that Plaintiff was "very schizophrenic," confused and lost in thought. Id. However, he also noted that Plaintiff's mood swings were gone and that he was not experiencing auditory or visual hallucinations, depression, delusions, or paranoia. Id. In October 2004, Dr. McEwen indicated that Plaintiff was less confused and less anxious. (Tr. 199).

---

[5] Abilify is a psychotropic drug indicated for the treatment of schizophrenia. Physicians' Desk Reference ("PDR") 1034-36 (58th ed. 2004).

In November 2004, Plaintiff reported that his car had broken down and that he had the "holiday blues" and indicated that he needed "more meds this time of year." Id. Plaintiff reported that his sleep was okay, but that he heard auditory hallucinations and Dr. McEwen increased his Abilify prescription. Id.

In December 2004 and January 2005, Plaintiff reported increased stress and anxiety. (Tr. 198). He also reported auditory and visual hallucinations in December, which continued into January, but were somewhat better. Id. In February 2005, the voices decreased and Dr. McEwen described Plaintiff as stable with no new problems. Id. In April and May of 2005, Plaintiff was reported as stable and doing well with his medications, which were working to eliminate his auditory hallucinations. (Tr. 197). Although Plaintiff complained of increased anxiety and depression and a lack of initiative in June 2005, Dr. McEwen noted that he was out of his medications at that time. Id. In July 2005, Plaintiff had some anxiety and was hearing voices, but his mood was stable and he was doing well. Id. In August 2005, Dr. McEwen reported that Plaintiff was doing well with no problems. Id.

On October 13, 2005, Plaintiff reported that he had increased the medication he had been prescribed "to escape." (Tr. 196). Dr. McEwen additionally noted that Plaintiff had improved and was not hearing any voices. Id. In November 2005, Plaintiff was discouraged about his disability claim. Id. On December 22, 2005, Dr. McEwen noted that Plaintiff was not happy and very discouraged. Id. In March 2006, Dr. McEwen reported that Plaintiff was doing well and his family was planning to move to Ohio. (Tr. 195). On June 1, 2006, Plaintiff reported that they were not moving to Ohio because he was worried that he would not get disability as soon. Id. On June 29, 2006, Dr. McEwen reported that Plaintiff was "very much improved" in his affect and mood and on

July 27, 2006, Dr. McEwen indicated that Plaintiff and his wife were expecting a baby and he had a new outlook. Id.

On September 13, 2006, about a week after Plaintiff's hearing, despite his most recent treatment notes from June to July, Dr. McEwen wrote a letter to Plaintiff's attorney, in which he opined that Plaintiff was "unusually and extremely disabled" by showing extreme difficulty handling others, delusions, and auditory hallucinations. (Tr. 238). He stated "it would be impossible for him to hold any gainful employment for he can rarely be in public alone without his wife." Id.

Plaintiff argues that when the ALJ assessed his RFC, he failed to properly consider Dr. McEwen's opinions, particularly his September 13, 2006 opinion, which stated that Plaintiff was disabled. Even though Dr. McEwen's September 13, 2006 opinion was issued after the ALJ's decision, the Appeals Council found that it was not a basis to review the ALJ's decision. (Tr. 6, 8). Defendant argues that the September opinion was not a "medical opinion" because it was not an opinion denoting specific limitations related to Plaintiff's mental condition. Instead, it was an opinion about whether or not Plaintiff was disabled, which was an ultimate issue for the ALJ to decide. See 20 C.F.R. § 416.927(e)(1-3) (stating that special significance will not be given to "the source of an opinion on issues reserved to the Commissioner," such as the administrative finding of a disability). Statements made by others, even treating physicians, are not controlling on this issue and no special significance is given to the source of such opinion. Id. The weight allotted to any statement depends upon the basis for the opinion, the extent to which any such opinion states the limiting factors that result in a conclusion of disability, and the degree to which that opinion is consistent with the rest of the record and supported by the evidence in the record. See 20 C.F.R. §§ 404.1527, 416.927.

11

Here, Dr. McEwen did not offer any limitations in work-related mental abilities such as understanding, remembering, carrying out simple instructions, using judgment, responding appropriately to supervision, co-workers, and usual work situations, and dealing with changes in a routine work setting. Therefore, Defendant contends that there should be no significant weight given to this opinion. See 20 C.F.R. § 416.927(e)(3). In August 2004, after only seeing Plaintiff twice, Dr. McEwen opined that Plaintiff was permanently disabled and that his activities were limited because he could not think clearly and heard voices. (Tr. 194). However, Dr. McEwen continued to treat Plaintiff in order to improve his condition, and the record illustrates his improvement. In July 2004, Dr. McEwen denoted that Plaintiff was improving, had more energy and better anxiety control after the prescription of medication. (Tr. 193). He also noted that Plaintiff had no auditory hallucinations in "a long time," no visual hallucinations, no delusions, no paranoia, and no flights of ideas. Id. Furthermore, there is contradictory evidence from other medical sources. Dr. Gibbs stated that she saw no clear evidence of schizophrenia, and Dr. Shah indicated that Plaintiff's affect was appropriate and that he was alert and oriented. (Tr. 189-91, 185). Therefore, Defendant argues that the record does not support the basis for disability stated in Dr. McEwen's August 2004 opinion.

Similarly, in Dr. McEwen's September 2006 opinion, he stated that Plaintiff was "unusually and extremely disabled" and that "it would be impossible for him to hold any gainful employment." (Tr. 238). Defendant argues that his opinion is inconsistent with the rest of the record and not supported by the evidence in the record. In March 2006, Plaintiff was described as doing well. (Tr. 195). In July 2006, Dr. McEwen indicated that Plaintiff and his wife were expecting a new child and he had a new outlook. (Tr. 195). After Dr. McEwen offered his opinion, on September 25, 2006 Plaintiff reported mood swings, irritability, and increased auditory hallucinations. (Tr. 239).

Therefore, Defendant contends that the record does not support the basis for the disability claim dictated by Dr. McEwen's September 2006 opinion because of Plaintiff's improved condition and the inconsistencies throughout the record.

Although Plaintiff argues that Dr. McEwen's opinion should be given controlling weight, the evidence offered by Ms. Crane, Dr. Shah, Dr. Gibbs, and Dr. Anton illustrates the abundance of evidence in support of the ALJ's decision to deny Plaintiff's disability claim. The evidence provided by these other individuals indicates that Plaintiff did not have schizophrenia, but rather had bipolar affective disorder, specifically ruling out schizophrenia, and indicated that Plaintiff was limited, but could still perform certain jobs. These inconsistencies within the record allowed the ALJ to determine whether Plaintiff is disabled by looking to all of the evidence in the record and weighing it accordingly. Furthermore, as Defendant explains, Dr. McEwen's opinion was not a medical opinion because it did not denote specific limitations corresponding to Plaintiff's mental condition. Rather, Dr. McEwen opined that Plaintiff was disabled, which was an ultimate issue for the ALJ to determine. Notably, Dr. McEwen continued to treat Plaintiff in order to improve his condition, and Plaintiff's condition improved over time and with medication. Thus, the ALJ had substantial evidence to support his determination that Plaintiff was not disabled.

    **B.    The ALJ correctly assessed Plaintiff and his wife's testimony.**

Plaintiff argues that the ALJ failed to consider his testimony and his wife's testimony concerning how his condition impacted him. Plaintiff contends that the ALJ erred because he selectively cited evidence concerning Plaintiff's capabilities and daily living activities and ignored Plaintiff's and his wife's further testimony. Hines v. Barnhart, 453 F.3d 559, 565 (4th Cir. 2006) (stating that the "ALJ selectively cited evidence concerning tasks which [Plaintiff] was capable of

performing"). Plaintiff argues that the ALJ failed to address testimony showing that he was unable to care for his daughter and that his depression was so significant that he failed to take care of his personal needs, including grooming, bathing and changing his clothes. (Tr. 266, 252). However, the ALJ must look to other indicators within the record when inconsistencies arise and determine the credibility of the testimonies based on the totality of the record. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); see also Hays, 907 F.2d at 1456; SSR 96-7p (1996) (stating that "if an individual's statements about pain or other symptoms are not substantiated by the objective medical evidence, the adjudicator must consider all of the evidence in the record, including any statements by the individual and other persons concerning the individual's symptoms").

Plaintiff testified that he had heard voices engaged in conversation, but that he had not heard them very often and had just recently started hearing them again. (Tr. 247-48, 253). Plaintiff's wife testified that he had started hearing voices four days before the hearing. (Tr. 265). She also testified that two months prior, Plaintiff started hearing voices again and Dr. McEwen increased his medication. Id. Notwithstanding Plaintiff's and his wife's testimony, Dr. McEwen's notes from May 2006 through July 2006 indicated that Plaintiff had not heard voices for more than nine months and that he had not increased the dosage of Abilify since Plaintiff started taking it again in December 2005. (Tr. 195-96).

Plaintiff also testified that crowds make him nervous, but that he drives to the grocery store weekly. (Tr. 249). He testified that he gets depressed, but that it is not a daily occurrence and "comes and goes." (Tr. 249-50). He testified that his depression does not result in crying; yet it makes him suicidal. (Tr. 250). Dr. Shah noted that Plaintiff specifically complained of crying spells during his evaluation in 2003. (Tr. 180). He indicated that he attempted suicide, including once in

2006 when he stuck razor blades in his arm, but he stated that he had not sought any medical treatment for his arm. Id. Dr. McEwen's treatment notes from 2006 did not indicate any such suicide attempt and Plaintiff repetitively told doctors he did not have any current suicidal ideations since 2003. Id.; (Tr. 180-81;182)

Plaintiff testified that he spent his day "[j]ust sitting around the house constantly doing nothing." Id. He explained that while sitting around the house, he listened to music and sermons on tape. (Tr. 251). He also testified that he goes to church regularly, engages in Bible study with his wife, and used to watch sermons on television until they were taken off the air. (Tr. 251, 258).

Plaintiff stated that he traveled to Ohio in 2006. (Tr. 257). He also testified that he does household chores occasionally such as cooking, cleaning the dishes, sweeping, mopping, vacuuming, washing and folding laundry, taking out the trash, cleaning the house, and cutting the grass. (Tr. 255-56, 259). He reported that he and his wife go out to eat, go to church, go to the grocery store, and go to her brother's home. (Tr. 259). He intermittently helps care for his young daughter, reads to her, and plays with her. (Tr. 257-58). Notably, during the hearing, Plaintiff went out of the room after testifying and took care of his daughter while his wife testified. (Tr. 19, 260).

Plaintiff testified that he does not change his clothes daily, but his wife stated that he does change his underwear and socks daily. (Tr. 252, 263). Plaintiff testified that he did not take care of his personal needs daily, sometimes not showering or bathing for months, and his wife testified that he had gone as long as a year without showering. Id. Plaintiff attributed this neglect to his depression; however, the ALJ considered contradictory evidence: in 2003, Dr. Gibbs noted that Plaintiff "cares for his hygiene" and in July 2004, Dr. McEwen noted that Plaintiff was of average grooming and hygiene. (Tr. 190, 192).

15

Based on the testimony and the record as a whole, the ALJ found Plaintiff's daily activities did not appear to be limited in any way and are inconsistent with his allegations of total disability. (Tr. 21). The ALJ stated that Plaintiff's "description of daily activities is representative of a fairly active and varied lifestyle and is not indicative of a significant restriction of activities or constriction of interests." Id. Furthermore, the ALJ's RFC finding took into consideration Plaintiff's subjective complaints to the extent that he found them credible. (Tr. 19, 21). Keeping in mind that the question is whether the ALJ's decision is supported by substantial evidence, the Court will find that the ALJ correctly determined Plaintiff's and his wife's credibility during their testimonies through analyzing the totality of the record.

    **C.**    **The ALJ correctly limited Plaintiff's RFC when posing the hypothetical question to the Vocational Expert.**

In order to determine whether Plaintiff was disabled, the ALJ posed a hypothetical question to the VE, which included limitations based on Plaintiff's testimony, the record as a whole, Plaintiff's age, education, work experience, and his RFC. (Tr. 18). The ALJ limited the hypothetical to only occasional exposure to crowds because he testified that crowds made him nervous. The ALJ's question also limited the stress level of any jobs by restricting his work setting to a low stress area with only occasional changes in the working setting and involving no production pace. Based on these limitations, the VE denoted jobs that existed in significant numbers in the national economy, which included a garment sorter, a nut sorter, and a leaf tier. The ALJ correctly assessed Plaintiff's limitations based on the entire record, including Plaintiff's and his wife's credible testimony, and posed an accurate hypothetical question to the VE. Relying on all this evidence, the ALJ determined that Plaintiff was not disabled.

Based on the foregoing reasons, the undersigned concludes that substantial evidence supports the ALJ's finding that jobs exist in significant numbers in the national economy that Plaintiff could perform given his RFC, and therefore Plaintiff was not disabled as defined by the Social Security Act during the time period in question.

## IV. ORDER

Accordingly, **IT IS HEREBY ORDERED THAT:**

1. "Plaintiff's Motion for Summary Judgment" (Document No. 11) is **DENIED**; the Defendant's "Motion for Summary Judgment" (Document No. 13) is **GRANTED**; and the Commissioner's decision is **AFFIRMED**.

2. The Clerk is directed to send copies of this Memorandum and Order to counsel for the parties.

Signed: June 10, 2008

David C. Keesler
United States Magistrate Judge